IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK 22-40804 |
| | ) | |
| DONALD DUANE KLEIN and NORMA JEAN KLEIN, | ) ) | Chapter 12 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | _____ |
| UNITED STATES OF AMERICA, | ) | Adv. Pro. 22-4020 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DONALD DUANE KLEIN and NORMA JEAN KLEIN, | ) ) | |
| | ) | |
| Defendants. | ) | |

**Preliminary Injunction**

THIS MATTER is before the court on the motion of the plaintiff the United States of America acting through the U.S. Small Business Association ("SBA") for an order enjoining the debtors from spending the balance of a $500,000 SBA loan, which the SBA asserts was procured by fraud. Amy Blackburn appeared for the SBA. Andrew Wurdeman appeared for the debtors. The SBA's motion is granted.

**Findings of Fact**

By March 2022, secured lenders foreclosed the debtors' real estate and replevied all their equipment.[1] The debtors filed this Chapter 12 case six months later on September 13, 2022. This is the debtors' third Chapter 12 case since 2019.[2] They voluntarily dismissed their second bankruptcy case on January 12, 2022, after their secured lenders filed motions for relief. The debtors were precluded from filing for this case for 180 days after their second case was dismissed.[3]

Two bank creditors filed motions to dismiss this case, asserting the debtors are not eligible for relief under Chapter 12 because they were not family farmers when they

---

[1] As to the replevin action, an order for delivery was entered February 16, 2022. The bank posted a bond and took possession in March 2022. A final order of replevin was issued on July 14, 2022. The debtors appealed. The case is pending in a Nebraska appellate court.

[2] The debtors filed a Chapter 12 case June 2, 2019. It was dismissed March 17, 2020 (BK19-40963). They filed another Chapter 12 case August 13, 2020. It was dismissed January 12, 2022 (BK20-41094). The debtors did not confirm a Chapter 12 plan in either case.

[3] *See* 11 U.S.C. § 109(g)(2).

1

filed.[4] When they filed, the debtors did not own farm real estate. They did not have farmland leased. They had not possessed any equipment since March 2022. The only source of income they scheduled was social security.

The debtors resisted dismissal. They asserted they were engaged in farming through 2021. For 2022 they asserted they owned fifteen cows, five calves, a one-half interest in a bull, and cash to operate. They acknowledged they did not have enough livestock for a cattle operation, and they needed some of the replevied equipment. They stated in an affidavit the banks knew this third case was imminent.

> *Our counsel consistently notified counsel for both banks that it would be necessary for us to file for Chapter 12* bankruptcy in order to continue our agricultural operation so we could deal with the capital gain taxes derived from the sale of farm assets.

The motions to dismiss were settled. A motion to approve the settlement is pending. Under the settlement, the debtors must sell the fifteen cows and five calves and pay the proceeds to the bank. They must pay $103,920 to get back *some* of their equipment. But in their schedules, they valued *all* the equipment at $88,850.

The source of the $103,920 payment is $224,405 in a deposit account, which according to the debtors' schedules is "unused SBA loan proceeds." The debtors applied for a $500,000 Covid hardship loan from the SBA on October 15, 2021, when their prior bankruptcy was pending. They were initially denied. They appealed the denial and were approved. The debtors obtained the loan on May 12, 2022, after their farm real estate was sold, and after the bank replevied the equipment. The loan is secured in part by the debtors' inventory, equipment, and deposit accounts.[5] The debtors did not schedule the SBA debt.

When he applied for the loan, Mr. Klein disclosed he was in bankruptcy. But he represented he was operating under an approved plan of reorganization, which was not true. When he obtained the SBA loan in May 2022, Mr. Klein also agreed or warranted:

---

[4] Debtors "must be engaged in a farming operation when they file the Chapter 12 petition." *Watford v. Federal Land Bank of Columbia (In re Watford)*, 898 F.2d 1525, 1527 (11th Cir. 1990). "The focus must be on the 'continuation' of farming endeavors and not on reviving abandoned operations." *In re Burke*, 81 B.R. 971, 976 (Bankr. S.D. Iowa 1987).

In addition to whether they were engaged in farming, there is a question whether the debtors have income to fund a Chapter 12 plan. *See* 11 U.S.C. § 109(f). Their income must be "sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title." *Id.* § 101(19).

Another question is whether there exists "some indicia of involvement on the part of the debtor in the farming activity which generates the income he seeks to have credited toward satisfaction of the income requirement." *See Otoe Cnty. Nat'l Bank v. Easton (In re Easton)*, 883 F.2d 630, 635 (8th Cir. 1989). It is not clear the debtor had any physical presence on a farm. Mr. Klein set foot in a sale barn only one time since the Covid pandemic started. He did not know where his cattle were located. He believed his cows were bred but was not certain. His daughter and granddaughter were caring for them.

[5] It is not clear whether the SBA's lien is perfected, but it has not been avoided.

- to use all the loan proceeds "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter";

- he did not fail to disclose any material facts to the SBA;

- he would preserve and account for any collateral and would not sell or transfer it except in the ordinary course of business;

- he would not distribute his assets or give preferential treatment to any company he controlled;

- There was no "substantial adverse change" in his financial condition including judgment liens, bankruptcy, or financial reverses.

The SBA loaned the debtors $500,000 on May 17, 2022. In the four months after the SBA loan was disbursed, the debtors spent $275,594.41 of the loan. One of the debtors' first payments was $35,000 to counsel for their previous bankruptcy case. In total they paid their bankruptcy counsel $103,284, of which they categorized $87,323.19 as "bankruptcy expenses". They spent $35,506 which they categorized as "litigation expenses", including a $27,010 bond they posted in the replevin action. Before they filed this case, they paid themselves $43,080.38 in the form of payments for "D&D Cattle – Investment – Don", checks to Mr. Klein for "silage", and cash withdrawals. For the same period they categorize another $32,624.65 as "owner draws", including payments to businesses like Walmart, Dollar General, Gary's Super Foods, and Arby's.[6] They paid personal medical bills totaling $8,525.65 and paid their daughter $3,000 for contract labor.

## Conclusions of Law

In determining whether to issue a preliminary injunction four factors should be considered:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "[N]o single factor is determinative." *Id.*; *see also Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) ("[A]ll of the factors must be considered to determine whether on balance, they weigh towards granting the injunction.").

The SBA asserts there is an immediate and irreparable harm because the debtors have dissipated and will continue to dissipate the remaining SBA loan, which is its collateral. Typically monetary injury does not constitute irreparable harm because it "can be estimated and compensated." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d

---

[6] The debtors' social security payments deposited into the account during the same time period totaled $11,354.80.

3

245, 249–50 (2d Cir. 1999). But in this case an exception to this general rule should also be considered.

> [A] perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied. For this reason, courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents.

*Id.* (citations omitted). The debtors are insolvent. Their only source of income is social security. If the loan proceeds are spent, a judgment the SBA cannot collect will not return the SBA to its previous position. The SBA demonstrated irreparable harm. This weighs in favor of an injunction.

The second factor is the balance of the harm. The SBA will be harmed if the debtors continue to dissipate the secured SBA loan which was to be used for "working capital" for an operating business. The harm to the debtors from not having immediate access to this loan is minimal. The debtors do not own any agricultural real estate. They have no agricultural leases. They possess no equipment. They propose to turn over to bank creditors the little livestock they have. Also, the proceeds are the SBA's cash collateral, which the debtors are not legally allowed to use without the SBA's consent or court order.

> The trustee may not use, sell, or lease cash collateral … unless each entity that has an interest in such cash collateral consents; or the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

*See* 11 U.S.C. § 363(c)(2). The SBA did not consent. The debtors did not seek court approval. Nevertheless, the debtors used the SBA's cash collateral post-petition.

Also, the debtors filed a Chapter 12 case. The SBA loan proceeds, if they are to be used at all, are best handled as part of a Chapter 12 plan. The debtors were unable to confirm a Chapter 12 plan in prior cases when they had real estate, equipment, and livestock. They have not proposed a plan in this case. They admit they must purchase cattle and equipment to make a Chapter 12 plan feasible. But where will they obtain cattle? How many do they require? Where will they raise them? Who must they employ? At what cost? Right now, any business operation is highly speculative. The balance of harm weighs in favor of an injunction.

As to the third factor, the SBA established a likelihood of success on the merits on its claim to except its debt from discharge under 11 U.S.C. § 523(a)(2)(A). The SBA asserts Mr. Klein falsely represented the debtors were engaged in and operating a business and would use the loan proceeds solely as working capital. A debtor is not discharged from a debt "to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To prevail on this claim, the SBA must establish:

> (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for the purpose of deceiving the creditor; (4) the creditor justifiably relied on the

representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made.

*Willmar Elec. Svcs. Corp. v. Dailey (In re Dailey)*, 592 B.R. 341, 349 (D. Neb. 2018). It is likely the SBA will establish it incurred a loss as a result of the representations given the debtors' financial condition.

The SBA justifiably relied on the representations the debtors made in their loan application and documents. The debtors applied for an Economic Injury Disaster Loan ("EIDL"). This loan is available only for small businesses facing a disaster. A small business concern includes enterprises engaged in "ranching and raising of livestock, agriculture, and all other farming and agricultural related industries." 15 U.S.C. 632(a)(1). The Coronavirus Preparedness and Response Supplemental Appropriations Act declared the coronavirus outbreak a disaster. It authorized the SBA to extend an EIDL to an enterprise that is a small business "*as of the date of application*". *See* 13 CFR 123.300(e) (emphasis added). To be eligible a small business applicant must be "an operating business" and must "demonstrate a need for the desired credit."[7] 13 CFR 120.100. To ensure the debtors qualify, the SBA must rely upon the debtor's representations in the application and loan documents.

Based on the evidence presented, Mr. Klein's representation the debtors were in business in May 2022 appears false. The debtors did not own agricultural real estate. They had no pasture lease. They did not possess equipment they needed to operate. They were involved in litigation regarding equipment collateral. Their cattle were intermingled with their daughter's. They know little about their purported operations. They intermingled their minimal livestock with their daughter's livestock. They did not know much about their cows, including where they were located or whether they were pregnant.

Mr. Klein also represented the debtors were operating under a confirmed Chapter 12 plan, which was false. He represented he would "use all the proceeds of this Loan solely as *working capital* to alleviate economic injury caused by disaster." (Doc. 1-1 Pg. 3).[8] The representation as to the use of the loan is related to a future act. "[A] debtor's promise related to a future act can constitute a false representation where the debtor possesses no intent to perform the act at the time the debtor's promise is made." *Dailey*, 592 B.R. at 350.

It appears likely the debtors did not use the SBA loan for working capital. Working capital is an accounting term. It generally is defined as current assets minus current liabilities. Working capital is a measure of short-term liquidity and is the money used to cover short-term operating expenses, such as short-term debt. In May 2022, the debtors owned fifteen cows, five calves, and half a bull. Even assuming this to be a farming operation, in the four months after obtaining the SBA loan, the debtors spent $275,594.41. The proceeds were paid mostly to their attorneys and counsel for

---

[7] The representation the debtors needed for $500,000 for working capital is also questionable. This amount was not necessary to tend for fifteen cows, five calves and half a bull.

[8] It is not clear the debtor's economic injury was caused by the Covid pandemic. Their operations were strained years before the pandemic occurred. According to the evidence, they were not profitable in the last four years.

5

"bankruptcy expenses" and other litigation expenses, and to themselves for day to day living expenses well over the amount they stated in their schedules they incurred monthly.[9] They now intend to use the loan to repay a long-term secured debts and settle protracted litigation.

The SBA is likely to establish the requisite knowledge and intent. "Because direct proof of intent (*i.e.*, the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 815 (B.A.P. 8th Cir.) (citations omitted), *aff'd*, 431 Fed. Appx. 521 (8th Cir. 2011). The debtors were aware they had no real estate, land leases or equipment. They immediately used the SBA loan proceeds, but not for working capital. One of the first payments was a $35,000 payment to their bankruptcy counsel for their prior bankruptcy. They paid funds to themselves and to other insiders. The debtors were insolvent at the time they obtained the loan. It does not appear they disclosed their financial situation, foreclosures, or the replevin lawsuit or order or delivery to the SBA. They applied for the SBA loan while "*consistently* notifying" the counsel for two bank lenders the debtors intended to file another bankruptcy. The debtors now seek to pay $103,920 of the remaining SBA loan proceeds for equipment they valued at less than $88,850.

In response to the motion for preliminary injunction, the debtors provide little evidence. They offered an 89-page affidavit, 87 pages of which were the debtors' tax returns and bank records and transactions. These records harm their position. Substantively, Mr. Klein declares he was engaged in business in May 2022 when he obtained the SBA loan. But he only supports this with his 2021 tax return. He also states he agreed to use the SBA secured loan to pay his other secured creditors to recover the replevied equipment and to purchase cattle, but this agreement was entered after the bankruptcy was filed.

The final element is the public interest, which also weighs in favor of a preliminary injunction. The plaintiff in this case is the United States of America. The public has an interest in making sure the SBA loan process is not abused and public funds designated to support small businesses impacted by the coronavirus pandemic are properly utilized.

## Conclusion

1. IT IS THEREFORE ORDERED: except as provided in Paragraph 3 below, Donald Duane Klein, Norma Jean Klein, and Sonya Klein Prentice, and their agents, servants, employees, attorneys, family members and those persons in active concert or participation with them are hereby ENJOINED AND RESTRAINED from withdrawing, distributing, giving away, encumbering, or otherwise removing from the jurisdiction of this court, any SBA loan proceeds or any SBA cash collateral paid to Donald Duane Klein or Norma Jean Klein from any checking or savings account, including without limitation any such loan proceeds or cash collateral on deposit with Pinnacle Bank, McCook.

2. IT IS FURTHER ORDERED: except as provided in Paragraph 3 below, Pinnacle Bank, McCook, and any financial institution that receives notice of this order and which holds on deposit SBA loan proceeds or SBA cash collateral paid to Donald

---

[9] The debtors scheduled monthly social security income of $4,726.88 and monthly expenses of $4,579.85, for net monthly income of $147.03.

    Duane Klein or Norma Jean Klein are ENJOINED AND RESTRAINED from transferring (by wire or other means), conveying, diminishing, or disposing of such loan proceeds, cash collateral, funds, and monies held in any deposit account. This includes, without limitation, the funds on deposit in Pinnacle Bank McCook in account number ending in *7631, or any other bank account holding funds transferred from Pinnacle Bank, McCook Account Number ending in *7361, after electronic transfer from the SBA to said account on May 12, 2022.

3. IT IS FURTHER ORDERED, this order does not apply to any social security income the debtors received *after* November 23, 2022, regardless of the account in which it was deposited. The debtors and SBA should determine whether the loan proceeds enjoined by this order or future social security payments should be deposited into a separate account.

The terms of this Preliminary Injunction will remain in full force and effect until the earlier of confirmation of a Chapter 12 plan in the debtors' bankruptcy case, resolution of this adversary proceeding, or further order of this court.

    Dated: December 7, 2022

                            BY THE COURT:

                            /s/ Brian S. Kruse
                            Brian S. Kruse
                            Bankruptcy Judge

Notice given by the court to:
Amy Blackburn*
Andrew D. Wurdeman

The movant (*) must serve this order on other parties as required by rule or statute.